FILED
2014 Feb-21  AM 10:37
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
### MIDDLE DIVISION

| | |
|---|---|
| **P A T R I C I A   A R C H E R , Individually and as Personal Representative of THE ESTATE of  C H A R L E S   R I C H A R D ARCHER** | ) ) ) ) ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **vs.** | )   **Civil Action No. CV-05-S-2466-M** |
| | ) |
| **MEAD CORPORATION,** *et al.*, | ) |
| | ) |
| **Defendants.** | ) |

## MEMORANDUM OPINION AND ORDER

This case is before the court on motions for summary judgment filed by

defendants MW Custom Papers, LLC, and MeadWestvaco Corporation,[1] as well as

two motions to strike.[2]  The action was originally filed in the Circuit Court of St. Clair

County, Alabama, during February, 2005.[3]  The complaint, as amended on October

---

[1] *See* doc. no. 113 (MW Custom Papers, LLC's Renewed Motion for Summary Judgment), and doc. no. 115 (MeadWestvaco Corp.'s Motion for Summary Judgment).

[2] *See* doc. no. 116 (Plaintiffs' [*sic*] Opposed Motion to Strike and Objection to Defendants' Motions for Summary Judgment), and doc. no. 126 (MW Custom Papers, LLC's Motion to Strike Certain Exhibits in Plaintiff's Evidentiary Materials).

[3] *See* doc. no. 1-3 (Copy of State Court Summons and Complaint), at ECF 1.  "ECF is the acronym for Electronic Case Filing, a filing system that allows parties to file and serve documents electronically." *Atterbury v. Foulk*, No. C-07-6256 MHP, 2009 WL 4723547, *6 n.6 (N.D. Cal. Dec. 8, 2009).  Bluebook Rule 7.1.4 allows citation "to page numbers generated by the ECF header." *Wilson v. Fullwood*, 772 F. Supp. 2d 246, 257 n.5 (D. D.C. 2011) (citing The Bluebook: A Uniform System of Citation R.B. 7.1.4, at 21 (Columbia Law Review Ass'n *et al.* eds., 19th ed. 2010)).  Even so, the Bluebook recommends "against citation to ECF pagination in lieu of original pagination." *Wilson*, 772 F. Supp. 2d at 257 n.5.  Thus, unless stated otherwise, this court will cite to the original

31, 2005, asserted claims against numerous defendants, including The Mead Corporation and MeadWestvaco Corporation.[4]  The gravamen of all of the claims was the allegation that Charles Archer had contracted mesothelioma as a result of his exposure to airborne asbestos fibers, originating from the use of raw asbestos fibers or asbestos-containing materials in a pipe manufacturing facility in Ragland, Alabama, known as The Cement Asbestos Products Company ("CAPCO"), in which plaintiff was employed from 1964 to 1976, *and*, a cement manufacturing plant operated under the name of the "National Cement Company," in which plaintiff was employed from 1976 to 2002.  Mesothelioma is a cancerous disease of the lining of the lungs caused by exposure to airborne asbestos fibers that usually is fatal.[5]

The case was removed to this court on December 1, 2005 by defendant

---

pagination in the parties' pleadings.  When the court cites to pagination generated by the ECF header, it will, as here, precede the page number with the letters "ECF."

The actual date plaintiffs filed their complaint is not in the record.

[4] MW Custom Papers, LLC, states in its Brief in support of its renewed motion for summary judgment that "there were thirty manufacturer defendants that allegedly manufactured products that contained asbestos and which Plaintiff's decedent, Charles Richard Archer, alleged he worked with or around . . . ."  Doc. no. 114 (MW Custom Papers, LLC's Memorandum of Law in Support of its Renewed Motion for Summary Judgment), at 1.

[5] *See* doc. no. 1-3 (Copy of State Court Summons and Complaint) ¶¶ 7, 12, 17; *see also* doc. no. 114-5 (Dec. 13, 2005 Deposition of Charles R. Archer), at 12.  "Mesothelioma" is defined by a generally-accepted medical dictionary as "a tumor derived from mesothelial tissue . . . . Malignant varieties [*e.g.*, *pleural* mesothelioma] are often the result of excessive exposure to asbestos."  *Dorland's Illustrated Medical Dictionary* 1134 (30th ed. 2003) (alteration supplied).  "Pleural mesothelioma" is characterized by the same learned treatise as "a malignant mesothelioma of the pleural space, often spreading widely and invading other thoracic structures; . . . It is usually fatal within one year."  *Id.* at 1135.

2

MeadWestvaco Corporation ("MeadWestvaco").[6]   It should be noted that

MeadWestvaco parenthetically referred to itself in the notice of removal as "Mead":

*i.e.*, "Defendant MeadWestvaco Corporation (*hereinafter referred to as* 'Mead')

hereby notices removal of this civil action from the Circuit Court of St. Clair County,

Alabama . . . ."[7] The removal was based upon the contention that this court possessed

"exclusive original jurisdiction over all controversies arising under" the

Comprehensive Environmental Response, Compensation, and Liability Act of 1980

("CERCLA").[8] The pertinent portions of the Notice of Removal read as follows:

> 4.    Plaintiffs' filed their Second Amendment to Complaint in the Circuit Court of St. Clair County (Alabama) on November 2, 2005. Paragraphs eight and nine of Plaintiffs' Second Amendment to Complaint state:
>
>> 8.    Pursuant to 42 U.S.C. § 7412(b)(1), asbestos is a hazardous air pollutant, and is therefore a "hazardous substance" as defined by Section 101(14) of U.S.C. § 9601 (14).
>>
>> 9.    Within the community of Ragland, Alabama, there exists a pipeline connecting residences and local businesses to various utilities. The

---

[6] *See* doc. no. 1 (Notice of Removal), at 1.

[7] *Id*. (emphasis supplied).  That same shorthand method of implying that the MeadWestvaco Corporation had acquired, merged with, or was a successor in interest to defendant The Mead Corporation ("Mead") was reiterated in MeadWestvaco's subsequent motion for a stay of proceedings, and its answer to plaintiff's complaint.  *See* doc. no. 3 (Motion for a Stay Pending Transfer by the Judicial Panel on Multidistrict Litigation), at 1; and doc. no. 4 (Answer to Second Amendment to Complaint), at 1.

[8] Doc. no. 1 (Notice of Removal) ¶ 1 (quoting 42 U.S.C. § 113(b), now recodified as § 9613(b)).

> pipeline existing in Ragland, Alabama is a "facility" within the meaning of Section 101(9) of CERCLA, 42 U.S.C. § 9601(9). This pipeline is composed of asbestos and asbestos products sold/manufactured by the Defendants.

(Second Amendment to Complaint, Attached as Exhibit "A")

> 5. Paragraphs eight and nine and Plaintiffs' second amendment to their complaint are drafted so as to expressly state a claim under federal law. Plaintiffs' claims thus fall within the original jurisdiction of the district courts.[9]

Notwithstanding those statements, all counts of the complaint clearly were premised upon state-law theories of recovery.[10]

For such reasons, plaintiffs quickly filed an "Emergency Joint Motion" asking for this court to remand the case to state court, as well as to permit plaintiffs' counsel

---

[9] *Id.* ¶¶ 4–5.

[10] The theories of recovery undergirding the claims were stated as follows: the "Alabama Extended Manufacturer's Liability Doctrine Manufacturer's [*sic*], Distributors, Sellers and/or Users of Asbestos Containing Materials" (Count One); "Negligence" (Count Two); "Conspiracy" (Count Three); "Gross Negligence, Wilful, Wanton and Intentional Wrongful Conduct" (Count Four); "[Negligence of Defendants] Mead, MeadWestvaco and National Cement" (Count Five); "Negligent Inspection, Negligent Undertaking by MeadWestvaco Corporation, as successor by merger to Mead Corporation, individually, and as successor in interest to Woodward Iron Company" (Count Six); "Fraudulent Suppression and Misrepresentation" (Count Seven); "Negligent Use, Production, Storage, Release and Disposal of Hazardous Waste Products of Defendant Mead and Defendant MeadWestvaco" (Count Eight); "Public Nuisance" (Count Nine); "Trespass" (Count Ten); "Tort of Outrage" (Count Eleven); "Battery" (Count Twelve); "Intentional Infliction of Emotional Distress" (Count Thirteen); "Negligent Infliction of Emotional Distress" (Count Fourteen); "Alabama Code § 7-2-314 Breach of Warranty" (Count Fifteen); "Second Restatement § 402 A Strict Liability" (Count Sixteen); "Fraudulent Suppression" (Count Seventeen); and, "Loss of Consortium" (Count Eighteen). Doc. no. 1-1 (Second Amendment to Complaint), at 2–3; doc. no. 1-3 (Copy of State Court Summons and Complaint), at ECF 11–28 (alteration supplied).

to  perpetuate the testimony of Charles Archer in the present case, and Alford Ray McGuffie in the companion case of *McGuffie v. Mead Corporation, et al.*, Civil Action No. CV-05-S-2473-M (N.D. Ala.), based upon the allegation that both men were near death from mesothelioma.[11]  With regard to the issue of remand, plaintiffs' counsel argued that MeadWestvaco's notice of removal

> was improper as to both Plaintiffs because:  (a) notice was never received by plaintiffs' counsel; (b) plaintiffs' counsel believes the cases were removed on defense counsels' assertion that the case contains allegations under CERCLA.  However, on its face, the Complaints contain no CERCLA count, and thus were improperly removed.  Even, *assuming arguendo*, that the complaint did contain a CERCLA [count], it would still be an improper basis upon which to remove the case to federal court.[12]

This court permitted plaintiffs' counsel to schedule video depositions on days, and at times and places, permitted by the physicians providing treatment to Messrs. Archer and McGuffie, as well as the administrators of the hospital in which they were housed, but held that aspect of their joint motion seeking remand in abeyance, pending compliance with a briefing schedule addressing that issue.[13]

Before the remand question became ripe for decision, however, the case was transferred on or about January 24, 2006, to the Eastern District of Pennsylvania ("the

---

[11] *See* doc. no. 6 (Emergency Joint Motion to Perpetuate Testimony Pursuant to Applicable Court Rules), at 1–2.

[12] *Id*. at 2 (grammatical errors and emphasis in original).

[13] *See* doc. no. 8, at 3–4.

MDL court") by the Judicial Panel on Multidistrict Litigation ("the MDL Panel"), for the purpose of promoting coordinated and consolidated pretrial proceedings among thousands of similar actions.[14]   Accordingly, this court heard nothing more of plaintiff's claims until sometime after September 16, 2011, when the remnants of the prior action were remanded by the MDL Panel.[15]

A summary of pertinent proceedings conducted in the MDL court is found in the following parts of the brief submitted by MW Custom Papers, LLC ("MW"):[16]

> 4.     On March 2, 2010, MW filed its first Motion for Summary Judgment based on Alabama's shareholder immunity defense and the Alabama Supreme Court's holding in *Henderson v. MeadWestvaco*, 23 So. 3d 625 (Ala. 2009), which applied Alabama's one-year-from-the-date-of-last-exposure statute of limitations applicable to pre-1979

---

[14] Doc. no. 82 (Defendants' Memorandum of Law in Opposition to Plaintiffs' Motion to Vacate Conditional Transfer Order (CTO-257)), at 1–2 (observing that, on July 29, 1991, the MDL Panel "transferred a total of 26,639 asbestos cases to the United States District Court for the Eastern District of Pennsylvania for coordinated and consolidated pretrial proceedings pursuant to 28 U.S.C. § 1407, and the Asbestos Products Liability Litigation, MDL Docket No. 875, (hereinafter 'MDL 875') was created," (citing *In re Asbestos Products Liability Litigation (No. VI)*, 771 F. Supp. 415, 424–25 (J.P.M.L. 1991), and, on January 24, 2006, the same Panel "issued CTO-275 conditionally transferring [the *Archer* and *McGuffie* actions] (along with [99] other actions) to MDL 875 . . . ." (alterations supplied)).

[15] Judge Eduardo C. Robreno of the MDL court entered a Conditional Remand Order (entitled "Suggestion of Remand") on Aug. 10, 2011, proposing that this action be remanded to the Northern District of Alabama, but allowing the parties a period of time within which to determine whether they would consent to a trial in the Eastern District of Pennsylvania. *See* doc. no. 134 (E.D. of Pa. doc. no. 140). Defendants initially filed a notice of their opposition to the proposed remand. The following month, however, defendants withdrew their opposition, and the MDL Panel entered an order lifting the stay on the Conditional Remand Order, and remanded the action to the Northern District of Alabama. *See* doc. no. 109 ("Order Lifting Stay of Conditional Remand Order," entered Sept. 12, 2011 as E.D. Pa. doc. no. 147) at 1. That order was docketed in this court on Sept. 16, 2011. *Id.*

[16] *See* doc. no. 114 (MW Custom Papers, LLC's Memorandum of Law in Support of its Renewed Motion for Summary Judgment).

asbestos exposures to the wrongful death claims of a former CAPCO worker.  (E. Dist. Pa. Docket Entry 7).

5.   MW Filed an additional Motion for Summary Judgment on July 9, 2010, based on the doctrine of release because Mr. Archer signed a release agreemend in the 1990s that released CAPCO's present and former parents and shareholders from any future claims related to Mr. Archer's alleged asbestos exposure (E. Dist. Pa. Docket Entry 35).

6.   On July 26, 2010, Plaintiff Patricia Archer filed a Motion to Substitute Proper Party and Suggestion of Death indicating that Mr. Archer died on May 22, 2009 (E. Dist. Pa. Docket Entry 36).  On August 30, 2010, the MDL court granted Plaintiff's motion, and added Patricia Archer as Personal Representative of the Estate of Charles Richard Archer, and substituted the Estate of Charles Richard Archer as the proper party.  (E. Dist. Pa. Docket Entry 44).

7.   On August 13, 2010, the MDL court issued an order granting MW's March 2, 2010 Motion for Summary Judgment based on Alabama's shareholder immunity defense, and thus did not address MW's other bases for summary judgment.  (E. Dist. Pa. Docket Entry 41).

8.   On August 23, 2010, Plaintiff filed a Motion for Reconsideration asking the MDL court to vacate its order granting summary judgment and order MW to respond to Plaintiff's discovery requests.  (E. Dist. Pa. Docket Entry 43).

9.   On January 14, 2011, the MDL court granted Plaintiff's Motion for Reconsideration, denied MW's motions for summary judgment without prejudice, and required MW to respond to Plaintiff's discovery requests.  (E. Dist. Pa. Docket Entry 99).

10.   MW filed a Renewed Motion for Summary Judgment on March 15, 2011, based on Alabama's shareholder immunity defense and Alabama's pre-1979 statute of limitations for asbestos exposure cases. (E. Dist. Pa. Docket Entry 105).

11.    On May 20, 2011, Plaintiff filed a Motion for Leave to File Amended Complaint, requesting that she be allowed to add MW Custom Papers, LLC, as a proper defendant to the action and to add a wrongful death claim under Alabama state law. (E. Dist. Pa. Docket Entry 123).

12.    On July 29, 2011, the MDL court issued its Order addressing MW's Renewed Motion for Summary Judgment. (E. Dist. Pa. Docket Entry 138, 139). The court found that "Plaintiffs' claims are not [barred by the pre-1979 exposure rule], as they have presented evidence that may show post-1979 exposure." (E. Dist. Pa. Docket Entry 139 at p. 19). The MDL court found that MW was entitled to summary judgment on Plaintiff's theories of liability based on product liability, voluntary assumption of the workplace safety obligations of CAPCO, and premises liability claims relating to exposures that allegedly occurred at Mead-owned dumpsites. *Id.* However, the MDL court allowed Plaintiff's negligent safety inspection claim to stand. *Id.*

13.    On August 11, 2011, the MDL court issued an Order to the Clerk for the United States Judicial Panel on Multidistrict Litigation, suggesting that this case be remanded back to this Court "for resolution of all matters pending within this case except punitive damages." (E. Dist. Pa. Docket Entry 140).

14.    MW filed a Motion for Reconsideration on August 12, 2011, which was denied by the MDL court on August 31, 2011. (E. Dist. Pa. Docket Entry 142, 144). In denying the Motion, the MDL court failed to substantively address whether, applying the post-1979 "discovery rule" statute of limitations, the instant claim was time barred because of Mr. Archer's 1993 lawsuit that alleged personal injuries as a result of asbestos exposure at the CAPCO plant.

15.    On September 7, 2011, the MDL court granted in part and denied in part Plaintiff's Motion for Leave to File Amended Complaint. (E. Dist. Pa. Docket Entry 145). The MDL court allowed the addition of MW Custom Papers, LLC, to reflect the correct corporate entity as a defendant. *Id.* However, the MDL court denied Plaintiff's request to amend the Complaint to add a wrongful death claim, stating that Plaintiff's two year delay in attempting to amend the Complaint to add

8

a wrongful death claim was unduly prejudicial to MW.  *Id.*

16.    On September 16, 2011, the Clerk of the Judicial Panel on Multidistrict Litigation issued an order remanding the case from the MDL and reopening it in this Court.  (Doc. 109).

17.    Following remand to this Court, the parties jointly designated documents from the Eastern District of Pennsylvania's docket for inclusion in the files to be remanded to the Northern District of Alabama on October 14, 2011, pursuant to Rule 10.4(a) of the Rules of Procedure of the Judicial Panel on Multidistrict Litigation.  (E. Dist. Pa. Docket Entry 148).[17]

According to the MDL Panel's remand order, the only claim that remains pending in this once sprawling suit against numerous defendants is an allegation that The Mead Corporation voluntarily undertook a duty to conduct safety inspections at the CAPCO plant, but did so negligently,[18] *asserted against MeadWestvaco* (the corporate successor to The Mead Corporation).[19]  Of course, such a claim is based

---

[17] Doc. no. 114 (MW Custom Papers, LLC's Memorandum of Law in Support of its Renewed Motion for Summary Judgment) ¶¶ 4–17 (footnote omitted).  It should be noted that, even though the MDL Panel's order of remand was docketed in this court on September 16, 2011, the record from the United States District Court for the Eastern District of Pennsylvania was not returned until more than a year later, *i.e.*, on or about October 5, 2012.  *See* doc. nos. 127, 128, 129, and 130 (Notice of Filing Record on Remand from MDL 875 parts 1 through 4).

[18] *See* doc. no. 116-13 (Memorandum Opinion on Defendant MW Custom Papers, LLC's Motion for Summary Judgment, entered July 28, 2011 as E.D. Pa. doc. no. 138), at 16 ("Mead voluntarily undertook inspections of CAPCO, and there remains a genuine issue of material fact as to whether Mead did so negligently."), and 19 ("Mead is entitled to summary judgment on all of Plaintiffs' claims except that Mead voluntarily undertook a duty to inspect the premises, and did so negligently."); *see also* doc. no. 128-24, at 16, 19 (same).

[19] *See* doc. no. 134 (Conditional Remand Order, entitled "Suggestion of Remand," entered Aug. 11, 2011 as E.D. Pa. doc. no. 140), at 2 ("The remaining viable Defendants [*sic*] in this case to be pursued at trial is: Meadwestvaco [*sic*] Corporation,"), and doc. no. 128-25 (Order denying MeadWestvaco's motion for summary judgment, entered July 28, 2011 as E.D. Pa. doc. no. 139).

upon state law.  Nevertheless, the MDL court expressly noted that it possessed

> supplemental jurisdiction over Plaintiffs' non-CERCLA state law claims pursuant to 28 U.S.C. § 1367.  Alabama law applies to the state-law claims at issue.  See Felder v. Casey, 487 U.S. 131, 151 ("Under Erie R. Co. v. Tompkins, 304 U.S. 64 (1938), when a federal court exercises diversity or pendent jurisdiction over state-law claims, 'the outcome of the litigation should be substantially the same . . . as it would be if tried in federal court.'").[20]

# I

During 1963, the Woodward Iron Company ("Woodward") and the American

Smelting and Refining Company ("Asarco") entered into an agreement to construct

a cement asbestos pipe production facility in Ragland, Alabama, to be jointly

operated under the name of The Cement Asbestos Products Company ("CAPCO").[21]

> Woodward was already in the pipe business, and wanted to "expand its manufacturing to include the production and sale of cement asbestos products, especially cement asbestos pipe."  Asarco was to supply the asbestos, via its subsidiary Lake Asbestos of Quebec, Ltd.  The division of the ownership of the plant was 60% Woodward / 40% Asarco.  The agreement provided that[, whereas] CAPCO "will be operated as a self-sufficient entity, the parties recognize that CAPCO can be operated with

---

[20] Doc. no. 116-13 (Memorandum Opinion on "MW Custom Papers, LLC's Motion for Summary Judgment," entered July 28, 2011 as E.D. Pa. doc. no. 138), at 3; see also doc. no. 128-24, at 3 (same).  This court would not have been so charitable.  See, e.g., Carnegie-Mellon University v. Cohill, 484 U.S. 343, 350 n.7 (1988) ("[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine — judicial economy, convenience, fairness, and comity — will point toward declining to exercise jurisdiction over the remaining state-law claims.").  The case is here, however, and it has been pending since 2005.  Accordingly, it compels decision.

[21] See doc. no. 116-13 (Memorandum Opinion on "MW Custom Papers, LLC's Motion for Summary Judgment," entered July 28, 2011 as E.D. Pa. doc. no. 138), at 11; doc. no. 128-24, at 11 (same); doc. no. 121-2 (Plaintiff's Opposition Memorandum) ¶ 25; doc. no. 121-6 (Woodward/Asarco Agreement, June 24, 1963), at ECF 2–3.

substantially greater economy and efficiency if Woodward will supply direcrt management supervision on a <u>consultant</u> basis, which it is willing to do . . . ."  Generally, "the affairs of CAPCO will be under the general management of the board of directors of six individuals, of whom three will always be designated by Asarco[, despite its minority stock position]."[22]

The CAPCO plant manufactured pipes from a combination of asbestos, cement, silica, and water.  Raw asbestos was delivered to the plant in bags that were opened by employees, and

> mixed with cement and silica into a "slurry," and then rolled into pipe form.  About 6,000 tons of asbestos were used per year in the manufacturing process at CAPCO.  There is testimony in the record that the worksite was consistently very dusty[, and that airborne asbestos fibers ("dust") was visible "everywhere" within the plant].[23]

Woodward and The Mead Corporation ("Mead") entered into a merger agreement on November 30, 1968, under the terms of which "Mead, as the surviving corporation, took over 'all the rights privileges, immunities, powers, franchises, and authority' of Woodward."[24]  As a result of that merger, Mead also acquired an

---

[22] Doc. no. 116-13 (Memorandum Opinion on "Defendant MW Custom Papers, LLC's Motion for Summary Judgment," entered July 28, 2011 as E.D. Pa. doc. no. 138), at 11 (citations omitted, alterations supplied, emphasis in original); *see also* doc. no. 128-24, at 11 (same). Woodward and Asarco executed an amendment to their original agreement on August 8, 1968, and Woodward's interest in the facility was reduced to 51 percent of the outstanding shares of stock, and Asarco's interst was increased to 49 percent.   *See* doc. no. 121-9 (Woodward/CAPCO/Asarco Amendment to Agreement, Aug. 8, 1968), at ECF 2.  Even after that amendment, Woodward retained a majority interest in the joint venture.

[23] Doc. no. 116-13 (Memorandum Opinion on Defendant MW Custom Papers, LLC's Motion for Summary Judgment, entered July 28, 2011 as E.D. Pa. doc. no. 138) at 2 (citations omitted, alteration supplied); *see also* doc. no. 128-24, at 2 (same).

[24] *Id.* at 12 (citation omitted).

ownership interest in another entity located in Ragland, Alabama, known as The

National Cement Company.[25]

> Both prior to and after the merger, Woodward, and then Mead, employed a Director of Safety, Stanley Mooney. Mooney performed safety inspections twice a month, would talk about any unsafe practices with employees, and would send a written report regarding his inspection. Under these circumstances, it is apparent that there was a corporate relationship between CAPCO and Mead that involved safety consulting.[26]

There is no information in the record, however, concerning the extent to which Mead

directed or conducted safety inspections at the National Cement plant, who may have

been responsible for those inspections, or any preventative actions taken (or not

taken) as the result of such inspections.

Charles Archer began working at CAPCO in 1964, as a machinist.[27] Archer

remained at CAPCO until 1976, when he went to work at the National Cement plant,

where he remained until his retirement in 2002.[28] Archer never returned to the

---

[25] Doc. no. 127-48 (Memorandum Opinion entered on Aug. 12, 2010 as E.D. Pa. doc. no. 40, and granting the motion for summary judgment of "Defendant MW Custom Papers, LLC"), at 2 n.1, *rev'd by* doc. no. 127-59 (Order entered on January 14, 2011 as E.D. Pa. doc. no. 99, and granting plaintiff's motion for reconsideration).

[26] Doc. no. 116-13 (Memorandum Opinion on Defendant MW Custom Papers, LLC's Motion for Summary Judgment, entered July 28, 2011 as E.D. Pa. doc. no. 138), at 12 (citation omitted); *see also* doc. no. 128-24, at 12 (same). Even though the Director of Safety identified numerous safety problems in recommendations submitted to management, plaintiff contends that Mead never conducted any "dust counts" in the plant, and that no affirmative steps were taken to reduce the concentration (quantity) of airborne asbestos fibers in the environment of, or improve the safety of working conditions within, the CAPCO plant. *See* doc. no. 121-2 (Plaintiff's Opposition Memorandum) ¶¶ 31–40.

[27] *See* doc. no. 114-5 (Dec. 13, 2005 Deposition of Charles R. Archer), at 12–13.

[28] *See id.* at 12, 86–87.

CAPCO plant after he ceased employment there in 1976.[29]

Mead's involvement in the operations of both the CAPCO and National Cement plants ended in 1974.  First, Mead sold its majority interest in the National Cement facility to Societe des Cements Vicat ("Vicat"), a French corporation, on February 22, 1974.[30]  On September 30th of that same year, Mead sold its majority interest in the CAPCO plant to Asarco.[31]  "In addition to the unsatisfactory performance at the plant[s], Mead cited the 'adverse development[]' of 'asbestos related cancer publicity' [as one of the reasons for divesting its interest in CAPCO and The National Cement Company]."[32]

---

[29] *See id.* at 85–86.

[30] *See* doc. no. 121-41 (Mead Corporation/Vicat Agreement, Mar. 15, 1974).

[31] *Compare* doc. no. 127-48 (Memorandum Opinion entered on Aug. 12, 2010 as E.D. Pa. doc. no. 40, and granting the motion for summary judgment of "Defendant MW Custom Papers, LLC"), at 2 n.1 ("As a result of the merger [of Mead and Woodward], Mead also acquired an ownership interest in National Cement.  Mead divested its ownership interests in National Cement on March 15, 1974[,] and CAPCO on September 30, 1974." (alterations supplied, citations omitted), *with* doc. no. 121-2 (Plaintiff's Opposition Memorandum) ¶ 42 (citing doc. no. 121-41 (Mead Corporation/Vicat Agreement, Mar. 15, 1974)) (where plaintiff argues that Mead sold the CAPCO plant to Vicat on February 22, 1974).  Contrary to plaintiff's assertions, the cited agreement between Mead and Vicat references only the National Cement plant, not the CAPCO plant.  *See* doc. no. 121-41 (Mead Corporation/Vicat Agreement, Mar. 15, 1974), at 1.  An agreement between Mead and Asarco that was submitted, but not cited, by plaintiff indicates instead that Mead sold all of its CAPCO shares and notes to Asarco on September 30, 1974.  *See* doc. no. 121-36 (Excerpts from Mead/Asarco Agreement Regarding CAPCO Sale, Sept. 30, 1974), at ECF 4.  The sale of CAPCO to Asarco is further supported by a summary of a Mead Executive Committee Meeting that occurred on Sept. 26, 1974, approving the sale of CAPCO to Asarco (and referencing the sale of National Cement to Vicat earlier in the year).  *See* doc. no. 121-12 (Mead Executive Committee Meeting Regarding CAPCO Sale, Sept. 26, 1974), at ECF 2, 4.  All evidence, therefore, points to Mead divesting itself of CAPCO on September 30, 1974, rather than February 22 of the same year, and to Asarco, not Vicat.

[32] Doc. no. 116-13 (Memorandum Opinion on "Defendant MW Custom Papers, LLC's Motion for Summary Judgment," entered July 28, 2011 as E.D. Pa. doc. no. 138), at 14 (first and

Thus, plaintiff's remaining claim against MeadWestvaco and/or MW Custom Papers, LLC, as successors-in-interest to The Mead Corporation, and based upon Charles Archer's employment at the CAPCO and National Cement plants, is limited to events that occurred during the period from 1968 to September 30, 1974: in other words, six of the twelve years that Charles Archer worked in the CAPCO facility (*i.e.*, 1964 to 1976), and a six-year period that ended two years prior to Charles Archer beginning work at the National Cement facility.

## II

It is important to note that the present action was not the first suit filed by Charles Archer that addressed his exposure to airborne asbestos fibers in the CAPCO plant. He initially joined a lawsuit in the Circuit Court of Jefferson County, Alabama on August 23, 1993, claiming, along with other plaintiffs, that he had developed asbestosis as a result of his employment in that facility.[33] In addition, Mr. Archer filed a separate lawsuit during 1995 in the District Court of Jefferson County, Texas, based upon the same nucleus of operative facts.[34]

---

third alterations supplied, second alteration in original, citation omitted); *see also* doc no. 128-24, at 14 (same); doc. no. 121-12 (Mead Executive Committee Meeting Regarding CAPCO Sale, Sept. 26, 1974), at ECF 3.

[33] *See* doc. no. 114 (MW Custom Papers, LLC's Memorandum of Law in Support of its Renewed Motion for Summary Judgment), at 9, 11 (citing doc. no. 114-5 (Dec. 13, 2005 Deposition of Charles R. Archer)); *see also* doc. no. 114-3 (Amended Complaint, *Albert R. Gray, et al. vs. William H. Beasley, et al.*, Civil Action No. CV 93-03405 (Cir. Ct. Jefferson Cnty., Ala.), at ECF 2–3.

[34] *See* doc. no. 114 (MW Custom Papers, LLC's Memorandum of Law in Support of its

The claims asserted in the Jefferson County, Alabama case were settled on September 11, 1995, in return for the payment of an undisclosed amount to Charles Archer.[35]   As part of the settlement, Charles and his wife jointly executed a "Pro Tanto Release and Indemnity" agreement, by the terms of which they released CAPCO and its "present and former parents, subsidiaries, successors, predecessors, and assigns . . . ."[36]  Pertinent portions of that document read as follows:

> 1.     For and in consideration of the sum of $1.00 (One Dollar and 00) and other good and valuable consideration, receipt and sufficiency of which is hereby acknowledged, the Employee hereby irrevocably and unconditionally releases, acquits and forever discharges . . . CAPCO . . . , their subsidiaries and affiliates, and their present and former agents, present and former directors, present and former officers, and present and former employees . . . from any and all charges, complaints, claims, liabilities, obligations, promises, agreements, controversies, damages, actions, causes of action, suits, rights, demands, costs, losses, debts and expenses (including attorney's fees and costs actually incurred), causes of action of whatever nature or character for personal injury, death, and asbestos-related illness or death, which the Employee may now have or hereafter have against the Released Parties, including by example, but not limited to, . . . *negligence* . . . loss of consortium, . . . judgment and expenses of any type whatsoever.
>
> . . . .
>
> 5.     This release is intended as a full and final Release as to the

---

Renewed Motion for Summary Judgment), at 9; *see also* doc. no. 114-5 (Dec. 13, 2005 Deposition of Charles R. Archer), at 35–37.

[35] *See* doc. no. 114-7 (Sep. 11, 1995 Pro Tanto Release and Indemnity Signed by Charles Richard Archer), at ECF 2; *see also* doc. no. 114-8 (Nov. 17, 2003 Deposition of Charles R. Archer), at 40–45.

[36] Doc. no. 114-7 (Sept. 11, 1995 Pro Tanto Release and Indemnity Signed by Charles Richard Archer), at ECF 2.

Released Parties and each of the Released Parties' present and former parents, subsidiaries, successors, predecessors, and assigns . . . .[37]

An additional *pro tanto* release, signed by Charles and Patricia Archer on August 25, 1994, appears in the record, but as the release was notarized in St. Clair County, Alabama, it is unclear whether the release was part of the consideration paid to settle the Texas suit or a third, undisclosed suit.[38]  Like the release signed on September 11, 1995, the August 25, 1994 release names CAPCO as a releasee, but does not reference National Cement.[39]  Charles Archer also acknowledges signing a third Release and Indemnity Agreement, dated December 19, 1994, but does not specify to what case that third agreement refers, nor was that agreement made available in the record for this case.[40]

Approximately eight years after executing the foregoing releases — *i.e.*, on or about January 7, 2003 — and more than two years before commencing the present action,  Charles Archer was diagnosed with mesothelioma.[41]  He died on May 22, 2009, and was subsequently replaced in this suit by his wife, Patricia, as personal

---

[37] *Id*. at ECF 2–3 (emphasis supplied).

[38] *See* doc. no. 114-6 (Aug. 25, 1994 Pro Tanto Release and Indemnity Signed by Charles and Patricia Archer), at ECF 3.

[39] *See id.* at ECF 2–3.

[40] *See* doc. no. 114-5 (Dec. 13, 2005 Deposition of Charles R. Archer), at 141.

[41] *See* doc. no. 119 (Medical Record Diagnosing Charles Archer with Mesothelioma, Jan. 7, 2003), at ECF 3–4.

representative of his estate.[42]

### III

The pleadings from the MDL court presented perplexing inconsistencies. For example, that court entered an opinion on July 11, 2011 stating, in its first sentence, that it addressed "*Defendant* ***MW Custom Papers, LLC's*** Motion for Summary Judgment."[43]   However, that declaration constitutes the only instance in the succeeding nineteen pages that MW Custom Papers, LLC, is described as the relevant, moving defendant.  Indeed, the first paragraph on the second page of the opinion provides that:

> Plaintiffs in the instant cases[44] have asserted claims based on alleged exposure to asbestos at the Cement Asbestos Products Company ("CAPCO") and National Cement plants in Ragland, Alabama.  It is undisputed that The Mead Corporation ("Mead")[,] as corporate predecessor *to named Defendant* ***MeadWestvaco Corporation***, was a shareholder of the above-mentioned plants from 1963 to 1974.[45]

Moreover, the concluding paragraph of the opinion, summarizing the court's

---

[42] Doc. no 127-51 (Order Granting Plaintiffs' Motion for Substitution of Parties, entered Aug. 30, 2010 as E.D. Pa. doc. no. 44).

[43] *See* doc. no. 116-13 (Memorandum Opinion on "Defendant MW Custom Papers, LLC's Motion for Summary Judgment," entered July 28, 2011 as E.D. Pa. doc. no. 138), at 1 (emphasis supplied); *see also* doc. no. 128-24, at 1 (same).

[44] The use of the plural noun "cases" is not a mistake, but refers to the fact that the MDL court's opinion addressed motions for summary judgment filed by "*Defendant MW Custom Papers, LLC*" in three companion cases:  *i.e.*, *Richard Archer v. Mead Corporation, et al.*; *Alford McGuffie v. Mead Corporation, et al.*; and *Rebekkah Riggs v. Mead Corporation, et al*.

[45] Doc. no. 116-13 (Memorandum Opinion on Defendant MW Custom Papers, LLC's Motion for Summary Judgment, entered July 28, 2011 as E.D. Pa. doc. no. 138), at 2 (footnote, alteration, and emphasis supplied); *see also* doc. no. 128-24, at 2 (same).

holdings, reads as follows:

> Based on the foregoing, Plaintiffs' claims are not time-barred, as they have presented evidence that may show post-1979 exposure. However, **Mead** is entitled to summary judgment on all of Plaintiffs' claims except [for the claim] that **Mead** voluntarily undertook a duty to inspect the premises, and did so negligently.[46]

Finally, the MDL court's Conditional Remand Order,[47] made final by the MDL Panel on September 12, 2011,[48] confounded the confusion by stating that "[t]he *remaining viable Defendants* [*sic*] in this case to be pursued at trial is: **Meadwestvaco** [*sic*] **Corporation**."[49]

Such inconsistencies caused this court to ask counsel during oral argument: Which entity is the proper defendant to respond to plaintiff's remaining claim — The Mead Corporation, MeadWestvaco Corporation, or MW Custom Papers, LLC?

## A

MW Custom Papers, LLC, represents that it is the successor-in-interest to *both* The Mead Corporation *and* MeadWestvaco Corporation.[50] MeadWestvaco reiterated

---

[46] *Id*. at 19 (emphasis and alteration supplied).

[47] *See* doc. no. 134 (Conditional Remand Order, entitled "Suggestion of Remand," entered Aug. 10, 2011 as E.D. Pa. doc. no. 140).

[48] *See* doc. no. 109 ("Order Lifting Stay of Conditional Remand Order," entered Sept. 12, 2011 as E.D. Pa. doc. no. 147).

[49] Doc. no. 134 (Conditional Remand Order, entitled "Suggestion of Remand," entered Aug. 10, 2011 as E.D. Pa. doc. no. 140), at 2 (alterations and emphasis supplied). *See also* doc. no. 128-25 (Order denying MeadWestvaco Corp.'s Motion for Summary Judgment, entered July 28, 2011 as E.D. Pa. doc. no. 139).

[50] *See* doc. no. 114 (MW Custom Papers, LLC's Memorandum of Law in Support of its Renewed Motion for Summary Judgment), at 1 ("MW is now the sole remaining defendant . . . .").

that contention in its motion for summary judgment:

> 3.      On January 29, 2002, The Mead Corporation and Westvaco Corporation became wholly owned subsidiaries of MeadWestvaco Corporation through a stock-for-stock exchange merger.  Subsequent to the merger, The Mead Corporation was merged into a newly formed entity, MW Custom Papers, Inc., which was later converted into a limited liability company, MW Custom Papers, LLC, with MeadWestvaco as its sole member.  *See* [doc. no. 115-1, Declaration of Anthony Oliver, Vice President and Assistant Treasurer of MW Custom Papers, LLC,] at ¶ 4.

> 4.      MW Custom Papers, LLC did not assign to MeadWestvaco any liabilities pertaining to the Woodward Corporation or liabilities that might have arisen relating to The Mead Corporation's ownership in stock of The Cement Asbestos Products Company.  *Id*. at ¶ 5.

> 5.      Accordingly,    MW    Custom    Papers,    LLC,    not MeadWestvaco Corporation, is the relevant successor to any liabilities that The Mead Corporation may have had pertaining to the allegations in this lawsuit.  MeadWestvaco's only connection to this matter is as the sole member of MW Custom Papers, LLC.  The proper defendant in this lawsuit is MW Custom Papers, LLC, not MeadWestvaco Corporation or The Mead Corporation.  *Id*. at ¶ 6.

> 6.      As such, any and all claims asserted in this lawsuit against MeadWestvaco fail as a matter of law.

> WHEREFORE, Defendant MeadWestvaco respectfully requests this Court to enter complete summary judgment in its favor and against Plaintiff.  In addition, MeadWestvaco requests the Court to enter an Order directing the Clerk's office to change the docket to reflect the sole reamining defendant in this action as "MW Custom Papers, LLC."[51]

## B

---

[51] Doc. no. 115 (MeadWestvaco Corp.'s Motion for Summary Judgment), at 2–3 (alteration supplied, emphasis in original, footnote omitted); *see also* doc. no. 114-2 (Declaration of Anthony Oliver in Support of Renewed Motion for Summary Judgment); doc. no. 115-1 (same).

The parties filed a "Joint Status Report" on December 30, 2013, addressing this issue, but not resolving it.  On the one hand, the parties stipulated that MW Custom Papers "is *a* correct Defendant" (emphasis intentional) in this case, as well as the companion case, *McGuffie vs. Mead Corporation, et al*., Civil Action No. CV-05-S-2473-M (N.D. Ala.).  Specifically, the Joint Status Report states that:

1.  The parties agree that MW, as successor in interest to Mead [The Mead Corporation], *is a correct Defendant* in both cases. Although MW was formally added by amendment only in the *Archer* case, MW voluntarily appeared as a party in numerous pleadings in both cases while this action was pending in the MDL and took the position that it, rather than its parent company, MeadWestvaco, was the proper defendant for the liabilities of Mead.

2.  Rule 21 of the Federal Rules of Civil Procedure provides "[o]n motion or on its own, the court may at any time, on just terms, add or drop a party."

3.  The parties agree that no party will be prejudiced by the Court's adding of MW as a defendant in both cases, in place of the defendant originally identified as Mead.  *See Nat'l Maritime Union of Am. v. Curran*, 87 F. Supp. 423, 426 (S.D.N.Y. 1949) ("[That Rule 21 may be used to substitute parties] . . . is the wiser answer to the problem of expediting trials and avoiding the unnecessary delay and expense of requiring an action to be started anew where a substitution is desired though the subject matter of the actions remains identical."); *see also* 7 Wright, Miller & Kane, *Federal Practice and Procedure*: *Civil 2d* § 1686, p. 463 (2d ed. 1986) ("[T]here is no reason why a substitution of parties cannot be made under Rule 21, in the discretion of the court and in the interest of justice, in situations not covered by Rule 25.").

4.  The parties agree and stipulate that it is not necessary for Plaintiffs to re-plead their claims against MW or to serve separate process on MW and that all prior claims asserted against either Mead or

MeadWestvaco are deemed to have been asserted against MW and relate back to the original filing of the complaints in these actions.  Likewise, prior pleadings and discovery responses submitted in the name of either MW, Mead, or MeadWestvaco, shall be deemed to have been made by MW, so that no re-pleading is required to effectuate this substitution.[52]

On the other hand, the parties could not not agree on the question of whether MW Custom Papers, LLC, should be viewed as the *only party* responsible for any liabilities that either Mead or MeadWestvaco may have incurred as a result of environmental conditions in the CAPCO plant during the period prior to the date on which Mead sold its entire interest in the facility to Asarco:

> 5.    The parties disagree with respect to whether MW's sole member, MeadWestvaco Corporation, should also remain a defendant in either case.  Defendant's position is that MeadWestvaco Corporation is not a proper defendant and should be dismissed.  MeadWestvaco Corporation has a pending summary judgment motion regarding this issue (Doc. No. 115 in *Archer*, and Doc. No. 106 in *McGuffie*). Plaintiffs disagree with this position and have filed oppositions to MeadWestvaco Corporation's summary judgment motions (Doc. No. 122 in *Archer*, and Doc. No. 111 in *McGuffie*).

> 6.    As the parties cannot reach agreement on this issue, they are content to allow the Court to rule on the pending motions and responses as to whether MeadWestvaco Corporation will remain a defendant in these actions.  Plaintiffs have recently received unverified discovery responses from MeadWestvaco Corporation, and have been promised the verification page on or before January 8, 2014.  Plaintiffs request until January 20, 2014, to submit a short supplemental response in opposition  to MeadWestvaco Corporation's summary judgment motion.

---

[52] Doc. no. 140 (Joint Status Report) at 2–3 (first alteration and emphasis supplied).

21

7.     Consequently, *the parties jointly request entry of an Order establishing that the current defendants in this action are* MW Custom Papers, LLC, as successor in interest to The Mead Corporation, and MeadWestvaco Corporation, prior to ruling on the pending motions in this action.[53]

In accordance with the joint request stated in paragraph number 7 above, this court entered an order directing the Clerk "to add MW Custom Papers, LLC, as successor-in-interest to The Mead Corporation, as a defendant in these cases."[54]

## C

Anthony Oliver, the Vice President and Assistant Treasurer of MW Custom Papers, LLC, prepared a Declaration that attempts to explain the historical origins of the various entities.  The relevant portions of that pleading read as follows:

2.     I have reviewed available materials pertaining to Mead's merger with Woodward Corporation and its resulting ownership of stock in the Cement Asbestos Products Company.  I have also reviewed historic documents discussed herein relating to Mead's divisions, National Cement Company and Murray Rubber Company, in order to enable me to make this declaration. Because of the long passage of time since the transactions and events discussed herein occurred, MW must rely on the language of historic documents that its predecessor companies retained or that our legal counsel has been able to obtain through its investigation in order to set forth the facts below.  MW has no employees with personal knowledge relating to the historic events

---

[53] *Id*. at 3–4 (emphasis supplied).

[54] Doc. no. 141 (Order entered in both the present action and *McGuffie v. Mead Corporation, et al*., Civil Action No. CV-05-S-2473-M (N.D. Ala.)), at 1.  That order further stated that "all pleadings and discovery responses previously filed or submitted by MW Custom Papers, LLC, The Mead Corporation, or MeadWestvaco Corporation are deemed adopted and incorporated by MW Custom Papers, LLC, without the necessity of MW Custom Papers, LLC re-pleading in either case." *Id.* at 1–2.

and transactions discussed herein involving Woodward Corporation, The Cement Asbestos Products Company, The National Cement Company, and Murray Rubber Company.

### Relationship Between The Mead Corporation, MeadWestvaco Corporation, and MW Custom Papers, LLC

3.     I have been informed by counsel that the named defendants in these lawsuits are "Mead Corporation" and "MeadWestvaco Corporation" and that Plaintiffs' claims in the lawsuits all involve allegations regarding Mead and its predecessor, Woodward Corporation.

4.     On January 29, 2002, Mead and Westvaco Corporation became wholly owned subsidiaries of MeadWestvaco Corporation through a stock-for-stock exchange merger.  Subsequent to the merger, Mead was merged into a newly formed entity, MW Custom Papers, Inc., which was later converted into a limited liability company, MW Custom Papers, LLC.

5.     MW assigned certain assets and liabilities of the former Mead Corporation to MeadWestvaco Corporation, *but not liabilities pertaining to the Woodward Corporation or liabilities that might have arisen relating to Mead's ownership in stock of The Cement Asbestos Products Company* ["CAPCO"].

6.     MW is a wholly owned subsidiary of MeadWestvaco Corporation and is the successor to any liabilities that Mead may have had pertaining to the allegations in these lawsuits.  Therefore, the proper defendant in these lawsuits is MW Custom Papers, LLC, not MeadWestvaco Corporation or the Mead Corporation.[55]

### D

Plaintiff generally denies that MW Custom Papers, LLC, is the only proper

---

[55] Doc. no. 114-2 (Declaration of Anthony Oliver in Support of Renewed Motion for Summary Judgment), ¶¶ 3–6 (alterations and emphasis supplied); *see also* doc. no. 115-1, ¶¶ 3–6 (same).

defendant, but offers no substantive evidence to rebut the declaration of Anthony Oliver. Instead, plaintiff attempts to discredit Oliver, saying that he was not a designated witness.[56] Plaintiff's argument is not persuasive. Anthony Oliver was designated as a witness under Federal Rule of Civil Procedure 30(b)(6), which permits a corporation to designate an officer who consents to testify on its behalf, and allows the corporation to "set out the matters on which each person designated will testify."[57] Fed. R. Civ. P. 30(b)(6). Anthony Oliver appeared at his deposition as such a witness, for the purpose of answering questions related to, among other matters, the corporate structure of defendants. He thus was presented for a proper purpose, and provided a declaration consistent with the purpose for which he was offered.

Further, plaintiff does not point to any substantive contradictions in the witness's testimony regarding the corporate posture of defendants; in fact, plaintiff recites the witness's explanation of the status of the Mead Corporation,

---

[56] *See* doc. no. 116-2 (Plaintiffs' [*sic*] Memorandum in Support of Plaintiffs' [*sic*] Opposed Motion to Strike and Objection to Defendants' Motions for Summary Judgment), ¶ 29; *see also* doc. no. 122-2 (Plaintiff [*sic*] Memorandum in Support of Plaintiffs' [*sic*] Response in Opposition to Defendant MeadWestvaco Corp.'s Motion for Summary Judgment), ¶¶ 2, 8. Plaintiff also generally argues that Anthony Oliver's declaration lacks credibility, as a prior deposition given by Oliver was inconsistent with a prior sworn affidavit of the same witness. *See* doc. no. 116-2 (Plaintiffs' [*sic*] Memorandum in Support of Plaintiffs' [*sic*] Opposed Motion to Strike and Objection to Defendants' Motions for Summary Judgment), ¶ 36. Plaintiff does *not* allege, however, that any part of Oliver's declaration is inconsistent with a prior affidavit or deposition.

[57] *See* doc. no. 116-2 (Plaintiffs' [*sic*] Memorandum in Support of Plaintiffs' [*sic*] Opposed Motion to Strike and Objection to Defendants' Motions for Summary Judgment), ¶ 30.

MeadWestvaco, and MW Custom Papers, LLC, as an undisputed fact.[58]

Instead, plaintiff contends that MeadWestvaco failed to respond to material discovery requests; and, thus, plaintiff is not able to present facts in opposition to MeadWestvaco's motion.[59]   In response, MeadWestvaco argues that it, *in effect*, responded to plaintiff's discovery request:   *that is*, *MW Custom Papers, LLC, responded* to plaintiff's discovery requests; and, rather than submit the same responses twice (once as MW Custom Papers, LLC, and again as MeadWestvaco), defense counsel chose to respond only once, as MW Custom Papers, LLC.[60]

## E

In addition to the Declaration of Anthony Oliver referenced in Part III.C above, a new piece of evidence regarding the corporate relationship between MW Custom Papers, LLC, and MeadWestvaco was made available to this court on January 27, 2014, in the form of a copy of the "Bill of Sale, Assignment and Distribution Agreement" executed by MW Custom Papers, LLC, on December 31, 2002.[61]  Under

---

[58] *See* doc. no. 122-2 (Plaintiffs' [*sic*] Memorandum in Support of Plaintiffs' [*sic*] Response in Opposition to Defendant MeadWestvaco Corp.'s Motion for Summary Judgment), ¶¶ 6–7.

[59] *See id.* ¶ 10.  Pursuant to Federal Rule of Procedure 56(d), plaintiff's counsel did provide an affidavit alleging that he cannot present facts essential to justify plaintiff's opposition to defendant's summary judgment motion, although plaintiff's counsel mistakenly references Federal Rule of Civil Procedure 56(f) as the applicable rule.  *See* doc. no. 122-8 (Rule 56(f) Affidavit), at ECF 1–2.

[60] *See* doc. no. 125 (MeadWestvaco Corp.'s Reply in Support of its Motion for Summary Judgment), ¶ 3.

[61] *See* doc. no. 143-4 (Bill of Sale, Assignment and Distribution Agreement, and Jan. 14, 2014 Cover Letter), at ECF 4–8.

the terms of that agreement, MW Custom Papers transferred to MeadWestvaco all "assets of every kind and nature whatsoever" ("the Distributed Assets"),[62] together with "all of the liabilities and obligations of every kind and nature whatsoever, contingent or otherwise, associated with the Distributed Assets,"[63] *except for* the assets and liabilities of "Divested Facilities": *that is*, "any facilities, real property, businesses or operations, or any part thereof, that have been conveyed to third parties prior to the Effective Time [*i.e.*, December 31, 2002], or that have been terminated, shut down or closed prior to the Effective Time . . . ."[64] As to the assets and liabilities of such "Divested Facilities," it was

> expressly agreed that any reserves maintained or insurance coverage or claims relating to any of these shall be specifically excluded from the Distributed Assets and shall remain available for the benefit of Distributor [*i.e.*, MW Custom Papers, LLC], regardless of where booked on the balance sheet of any affiliate of Distributor.[65]

Both the CAPCO and National Cement plants had been conveyed to third parties prior to "the Effective Time" of December 31, 2002.[66] Thus, both constituted "Divested Facilities" under the terms of the "Bill of Sale, Assignment and Distribution Agreement." Consequently, any claims and liabilities related to the

---

[62] *Id*. at ECF 4, ¶ 1.

[63] *Id*. ¶ 2.

[64] *Id*. at ECF 5, ¶ 5.

[65] *Id*. (alterations supplied).

[66] That is, CAPCO was sold to Asarco, and National Cement conveyed to Vicat. *See supra* note 31.

operation of either the CAPCO plant or National Cement facility were retained by MW Custom Papers, LLC.

**F**

Ultimately, defendant MeadWestvaco has provided evidence in the form of a declaration by a corporate representative supporting its contention that it is not the proper party in this action, and that contention is further supported by the Bill of Sale Agreement.  Plaintiff, on the other hand, has failed to present any substantive rebuttal evidence designating specific facts showing a genuine issue for trial.  *See, e.g., Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986) (requiring the nonmoving party in a motion for summary judgment to go beyond the pleadings to designate specific facts showing that there is a genuine issue for trial).

Thus, in light of the Bill of Sale Agreement, combined with the Declaration of Anthony Oliver, and in the absence of substantive evidence to the contrary, this court concludes that there is no genuine issue of material fact concerning the question of whether MW Custom Papers, LLC, retains sole liability for claims relating to The Mead Corporation's former majority interest in the CAPCO plant.  Accordingly, MeadWestvaco's Motion for Summary Judgment is due to be granted.[67]

---

[67] Though plaintiff contends that "it is not clear that the transfer back to Meadwestvaco excludes the contractual and voluntary inspection services provided at CAPCO by Mead Corporation and its Woodward Division," and further that "[i]t also is not clear whether the document attempts or does in fact leave MW Custom Papers LLC lawfully responsible for the asbestos fibers and pipe carried, vented, and dumped outside CAPCO and National Cement," these bare assertions of

# IV

The sole claim remanded to this court is a contention that, during the period that The Mead Corporation ("Mead") held a majority of the shares of stock in the corporate joint venture known as "The Cement Asbestos Products Company," Mead voluntarily assumed a duty to conduct safety inspections in the CAPCO plant, but performed that function negligently.[68]   The MDL court essentially held that, even though that theory raised significant issues of proximate causation, a jury *possibly could* determine that a negligent inspection of the CAPCO plant was conducted by Mead *prior to September 30, 1974* — the date on which, as discussed in Part I, at note 31, *supra*, Mead sold its entire interest in the CAPCO plant to Asarco — and that such negligence *could have* resulted in Charles Archer's exposure to asbestos *after May 19, 1980*, the effective date of those amendments to Alabama's statute of limitations that are discussed below (*in other words*, nearly six years after Mead had divested itself of any interest in the CAPCO plant).

With regards to National Cement, the MDL court held:

---

ambiguity, without more, are not sufficient to create a genuine issue of material fact.  Doc. no. 143 (Plaintiffs' [*sic*] Supplemental Memorandum in Opposition to MeadWestvaco's Motion for Summary Judgment), at 3–4 (alterations supplied).

[68] *See, e.g.*, doc. no. 116-13 (Memorandum Opinion on Defendant MW Custom Papers, LLC's Motion for Summary Judgment, entered July 28, 2011 as E.D. Pa. doc. no. 138) at 19 ("Mead is entitled to summary judgment on all of Plaintiff's claims except [the claim] that Mead voluntarily undertook a duty to inspect the premises, and did so negligently." (alteration supplied)); *see also* doc. no. 128-24, at 19 (same).

Both parties' moving papers focus on Mead's involvement at CAPCO, and do not provide as much information regarding Mead's involvement in the closely-related National Cement plant. However, as Mead has conceded that it had an ownership interest in National Cement and did not move for summary judgment specifically on its duty (or lack thereof) with respect to National Cement. [sic] View [sic] the factual record in the light most favorable to Plaintiffs, as the Court must, the Court accepts for purposes of the motion that Plaintiffs' theories apply equally to CAPCO and National Cement.[69]

Thus, although not specifically alleged by plaintiff, the MDL court appeared to hold that plaintiff had also alleged that Mead voluntarily assumed a duty to conduct safety inspections in the *National Cement* plant, but performed that function negligently.

## A

The Alabama statute of limitations that generally applies to negligence claims provides that actions for personal injury must be filed no later than two years after the date of the injury giving rise to the cause of action. *See* Ala. Code § 6-2-38 (1975) (2005 Replacement Vol.) (establishing two years as the "catch-all" statute of limitations for personal injury claims not arising under contract);[70] *see also, e.g.*, *Piazza v. Ebsco Industries, Inc.*, 273 F.3d 1341, 1347 (11th Cir. 2001) ("The statutory

---

[69] *Id.* (typographical error and sentence fragment in original).

[70] The statute cited in text reads as follows:

(l) All actions for any injury to the person or rights of another not arising from contract and not specifically enumerated in this section must be brought within two years.

Ala. Code § 6-2-38 (1975) (2005 Replacement Vol.).

period of limitations for negligence actions, found at Ala. Code § 6-2-38, is two years from the date the injury occurred."); *Henson v. Celtic Life Insurance Co.,* 621 So. 2d 1268, 1274 (Ala. 1993) ("The statutory period of limitations for negligence and wantonness actions, found at Ala. Code 1975, § 6-2-38, is two years from the date the injury occurred.").

Even so, the statute of limitations for a personal injury caused by exposure to asbestos is different.  Such a cause of action accrues "on the first date the injured party, through reasonable diligence, should have reason to discover the injury giving rise to such civil action."  Ala. Code § 6-2-30(b).[71]

The law was not always thus.  As the Alabama Supreme Court observed in *Henderson v. MeadWestvaco*, 23 So. 3d 625 (Ala. 2009):

> "Under §§ 6-2-30 and 6-2-39 of the Alabama Code of 1975 [as the laws existed prior to May 19, 1980:  the effective date of Act. No. 80-566, discussed below], all actions for injury to the person not arising from contract must be commenced within one year after the cause of action has accrued. In *Garrett v. Raytheon*, [368 So. 2d 516 (Ala. 1979),] the Court held that a cause of action for radiation injury accrued and 'the statute of limitations of one year

---

[71] The statute cited in text reads as follows:

(b) A civil action for any injury to the person or rights of another resulting from exposure to asbestos, including asbestos-containing products, shall be deemed to accrue on the first date the injured party, through reasonable diligence, should have reason to discover the injury giving rise to such civil action.  This subsection shall not apply to or affect in any way, actions referred to in Sections 6-5-482.

Ala. Code § 6-2-30(b) (1975) (2005 Replacement Vol.).

> began to run when plaintiff was last exposed to radiation
> and plaintiff's ignorance of the tort or injury, there being
> no fraudulent concealment, does not postpone the running
> of the statute until the tort or injury is discovered.' 368 So.
> 2d at 521. Asbestos injury, like radiation injury, results
> from a latent, insidious agent and, prior to the passage of
> Act No. 80-566 [an amendment to § 6-2-30 that applied a
> discovery rule to the accrual of causes of action arising
> from exposure to asbestos] and Act No. 79-468, Alabama
> Acts of 1979 [adding § 6-5-500 *et seq.*, Ala. Code 1975],
> following *Raytheon*, a claim based on asbestos injury
> would have accrued on the last date of plaintiff's exposure
> to defendant's product."
>
> [*Tyson v. Johns-Manville Sales Corp.*, 399 So. 2d 263, 268 (Ala. 1981)
> (footnote omitted)]. In *Tyson*, this Court held that "if, before the
> effective date of Act No. 80-566, [May 19, 1980,] one year had elapsed
> between the date of plaintiff's exposure and the date on which plaintiff's
> action was commenced, then that claim is nevertheless barred by the
> statute of limitations." 399 So. 2d at 267.

*Henderson*, 23 So. 3d at 630 (first alteration and alterations to *Garrett* and *Tyson*

citations supplied, all other alterations in original).  Therefore, based on the law as

it existed at that time, any action by Charles Archer based on a personal injury

resulting from asbestos exposure prior to May 19, 1980, had to be commenced within

*one year* of that exposure.  *See id.* at 630 (holding that plaintiff's claim of personal

injury resulting from asbestos exposure accrued in 1972, and thus was time-barred

in 1973).

Charles Archer ceased employment at CAPCO in 1976.[72]  He confirmed in a

---

[72] *See* doc. no. 114-5 (Dec. 13, 2005 Deposition of Charles R. Archer), at 12–13.

deposition taken in 1998 that he never returned to the CAPCO plant after 1976.[73]

Thus, the last date of exposure cannot have occurred any later than 1976, and any

personal injury claim resulting from asbestos exposure at the CAPCO plant was

barred by 1977.  Thus, there are no set of facts upon which plaintiff can prevail on a

theory that Charles Archer was exposed to asbestos at the CAPCO plant after May

19, 1980, and summary judgment is therefore due to be granted to defendants on

plaintiff's claim of negligent inspection of the CAPCO plant.

## B

The only theory of recovery remaining to Charles Archer, therefore, is a claim

that his exposure to asbestos was caused by The Mead Corporation's alleged

negligent inspection of the National Cement Company facility.  The motions, briefs,

and evidentiary submissions in this case primarily concern events occurring at the

CAPCO plant only; in fact, plaintiff's only substantive factual allegation involving

the National Cement facility is a contention that plaintiff was exposed to asbestos at

the CAPCO dumpsite, which was located on property owned by National Cement.[74]

That count of plaintiff's complaint was dismissed by the MDL court.[75]  It is clear

---

[73] *See* doc. no. 114-4 (June 10, 1998 Deposition of Charles Richard Archer), at 25.

[74] *See, e.g.*, doc. no. 114 (MW Custom Papers, LLC's Memorandum of Law in Support of its Renewed Motion for Summary Judgment), at 27.

[75] *See* doc. no. 116-13 (Memorandum Opinion on "MW Custom Papers, LLC's Motion for Summary Judgment," entered July 28, 2011 as E.D. Pa. doc. no. 138), at 18–19; *see also* doc. no. 128-24, at 18–19 (same).

from the record that plaintiff never made any specific factual allegations, or presented any evidence pertaining to Mead's negligent inspection of the National Cement plant.

As the Eleventh Circuit has observed, when discussing summary judgment on issues for which the non-moving party would bear the burden of proof at a trial,

> the moving party is not required to support its motion with affidavits or other similar material negating the opponent's claim in order to discharge this initial responsibility. *Instead, the moving party simply may show [ ]-that is, point[ ] out to the district court-that there is an absence of evidence to support the non-moving party's case.* Alternatively, the moving party may support its motion for summary judgment with affirmative evidence demonstrating that the non-moving party will be unable to prove its case at trial.

*Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115–16 (11th Cir. 1993) (quoting *United States v. Four Parcels of Real Property*, 941 F.2d 1427, 1437–38 (11th Cir. 1991)) (emphasis supplied, alterations in original).

MW Custom Papers, LLC, points out that "there is no evidence" suggesting that "Mead conducted any inspections at National Cement," or "that Mr. Archer was exposed to asbestos" while employed at the National Cement Company facility during the period from 1976 through 2002.[76]

In contrast, plaintiff has not presented a single factual allegation, much less affirmative evidence, pertaining to a negligent inspection of the National Cement Company facility. While Charles Archer might have been exposed to asbestos during

---

[76] *See, e.g.*, doc. no. 114 (MW Custom Papers, LLC's Memorandum of Law in Support of its Renewed Motion for Summary Judgment), at 25, 27.

his employment at National Cement, plaintiff's briefs and evidentiary submissions make no allegations connecting any such exposure to a negligent inspection committed by representatives of Mead.[77]  Thus, plaintiff's general claim of asbestos exposure at the National Cement plant, absent any specific allegation of a negligent inspection of that plant prior to 1974, cannot prevent an award of summary judgment in favor of defendants.  *See, e.g.*, *Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 592 (11th Cir. 1995) ("'[M]ere general allegations which do not reveal detailed and precise facts' will not prevent the award of summary judgment upon a court's determination that no genuine issue for trial exists." (quoting *Franz Chemical Corp. v. Philadelphia Quartz Co.*, 594 F.2d 146, 150 (5th Cir. 1979)[78]).

In summary, because any claim based upon asbestos exposure during plaintiff's employment at the CAPCO plant is barred by the statute of limitations, and there are neither factual allegations nor evidentiary materials in the record to support plaintiff's claim of a negligent inspection of the National Cement Company plant by the Mead Corporation prior to February 22, 1974, when it was sold to Vicat, MW Custom

---

[77] Any alleged inspection would have had to have occurred prior to 1974, when Mead sold all interest in the National Cement Company, a full two years before Charles Archer began employment at National Cement, and six years before the asbestos exposure that is the subject of this action.

[78] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

Papers, LLC's motion for summary judgment is due to be granted.[79]

## V

Finally, plaintiff alleges that defendants' motions for summary judgment are procedurally barred, and should be stricken, because they were not raised within the dispositive motion deadlines set by the scheduling order entered in the MDL court.[80] That argument is not persuasive.

The Northern District of Alabama is not bound by a scheduling order issued for the purposes of case management in the Eastern District of Pennsylvania. Each district court has wide discretion to manage its own docket. *See, e.g.*, *Clinton v. Jones*, 520 U.S. 681, 683 (1997) ("[T]he District Court has broad discretion to stay proceedings as an incident to its power to control its own docket."); *Wilson v. Farley*, 203 Fed. App'x 239, 250 (11th Cir. 2006) ("A district court retains the inherent authority to manage its own docket.").

The procedural posture of this litigation has been unusual. Usually, the court issues a scheduling order following receipt of the parties' report of their Rule 26(f) status conference. This case, however, was transferred to the Eastern District of

---

[79] It should be noted that the releases signed by Charles Archer and his wife apply to CAPCO only, and not the National Cement Company, and therefore MW Custom Papers, LLC's argument in the alternative that plaintiff's claims are barred under the doctrine of release cannot prevail. As noted above, however, summary judgment is due to be granted on other grounds.

[80] *See* doc. no. 116 (Plaintiffs' [*sic*] Opposed Motion to Strike and Objection to Defendants' Motions for Summary Judgment) ¶¶ 2, 4.

Pennsylvania by the MDL Panel before a status conference occurred.  When the case was remanded, it was not accompanied by any documents, other than a copy of the MDL docket sheets, and the individual filings identified on those docket sheets were not immediately accessible to this court.[81]   All of the motions discussed in this opinion were filed before this court gained access to the case file, and could review copies of pleadings filed in the MDL court.[82]

Thus, the issuance of a scheduling order before obtaining the relevant portions of the record in the MDL court would have been unreasonable.  In the interim, this court issued appropriate orders establishing response deadlines to assure a "just" and "speedy" resolution of the case.  *See Wieters v. Roper Hospital, Inc.*, 58 F. App'x 40, 43 (4th Cir. 2003) (holding that the absence of a formal scheduling order does not disrupt the development of a case where the court promptly manages and schedules hearings on motions where appropriate).  In short, there is no basis to conclude that defendants were bound by *any* scheduling order on the dates their renewed motions for summary judgment were filed.  Defendants' motions were timely and plaintiff's

---

[81] *See* doc. no. 109 ("Order Lifting Stay of Conditional Remand Order," entered Sept. 12, 2011 as E.D. Pa. doc. no. 147).

[82] *Compare* doc. no. 113 (MW Custom Papers, LLC's Renewed Motion for Summary Judgment, filed Aug. 10, 2012); doc. no. 115 (MeadWestvaco Corp.'s Motion for Summary Judgment, filed Aug. 17, 2012); doc. no. 116 (Plaintiffs' [*sic*] Opposed Motion to Strike and Objection to Defendants' Motions for Summary Judgment, filed Aug. 28, 2012); *and* doc. no. 126 (MW Custom Papers, LLC's Motion to Strike Certain Exhibits in Plaintiff's Evidentiary Materials, filed Oct. 3, 2012), *with* doc. nos. 127, 128, 129, and 130 (Oct. 5, 2012 Notice of Filing Record on Remand from MDL 875, parts 1 through 4).

motion to strike is due to be denied.

## VI

For the reasons stated in Parts I through IV, *supra*, the renewed motions for summary judgment filed by defendants, MeadWestwaco Corporation and MW Custom Papers, LLC, are due to be granted.  For the reasons stated in Part V above, plaintiff's motion to strike defendants' renewed motions for summary judgment is due to be denied.  The motion of defendant MW Custom Papers, LLC, to strike fewer than all of plaintiff's evidentiary materials will be denied as moot.  A final judgment consistent with this opinion will be entered contemporaneously herewith.

**ENTERED** this 21st day of February, 2014.

_____
United States District Judge